IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| ARVEST BANK, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PRESTON E. BYRD, DONETTE L. | ) | |
| BYRD, and PRESTON E. BYRD | ) | |
| IRREVOCABLE INSURANCE TRUST, | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |
| and | ) | Nos. 10-2004, 10-2007 |
| | ) | |
| ARVEST BANK, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ORSON T. SYKES, JAMES D. | ) | |
| HUTTON, and HORIZON HOLDING | ) | |
| COMPANY, LLC, | ) | |
| | ) | |
|     Defendants. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

    Before the Court is the December 7, 2010 Motion for Summary Judgment Against Defendant Orson T. Sykes for Fraud ("Motion") filed by Plaintiff Arvest Bank ("Arvest").[1]  (Pl. Arvest Bank's Mot. for Summ. J. Against Def. Orson T. Sykes for Fraud, ECF No.

---

[1] Unless otherwise stated, the documents cited in this Order were filed in Arvest Bank v. Sykes, No. 10-2007, which has been consolidated with Arvest Bank v. Byrd, No. 10-2004. (See Order, ECF No. 30.)

42.) ("Arvest's Mot.") Defendant Orson T. Sykes ("Sykes") responded in opposition on January 20, 2011. (Def. Orson T. Sykes' Resp. in Opp'n to Arvest Bank's Mot. for Summ. J. for Fraud, ECF No. 55.) ("Sykes' Resp.") For the following reasons, Arvest's Motion is DENIED.

I. Background[2]

In 2006 and 2007, Horizon Holding Company, LLC ("Horizon Holding") sought financing for the acquisition and construction of a multifamily low and moderate income housing facility in Memphis to be known as the Lamar Crossing Apartments project ("Lamar Crossing project"). (See Pl. Arvest Bank's Separate Statement of Material Facts in Supp. of Mot. for Summ. J. Against Def. Orson T. Sykes on Claim for Fraud ¶ 1, ECF No. 42-2 ("Arvest's Statement of Material Facts"); Resp. to Arvest Bank's Separate Statement of Material Facts in Supp. of Mot. for Summ. J. Against Def. Orson T. Sykes on Claim for Fraud ¶ 1, ECF No. 56 ("Sykes' Resp. to Arvest's Statement of Material Facts").) Preston Byrd ("Byrd") served as an agent and chief manager for Horizon Holding as to the Lamar Crossing project. (See Arvest's Statement of Material Facts ¶ 2; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 2.)

---

[2] Unless otherwise stated, all facts discussed in this Part are undisputed for purposes of Arvest's Motion.

The Health, Educational and Housing Facility Board of the City of Memphis issued $8,100,000 in Multifamily Housing Revenue Bonds. (See Arvest's Statement of Material Facts ¶ 3; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 3.) To finance the renovation, construction, and improvement of the Lamar Crossing project, Arvest was the primary lender and the purchaser of the Lamar Crossing project bonds, investing $8,219,576.81 in the Lamar Crossing project. (See Arvest's Statement of Material Facts ¶¶ 3-4; Sykes' Resp. to Arvest's Statement of Material Facts ¶¶ 3-4.) Arvest owns all of the Lamar Crossing project bonds. (See Arvest's Statement of Material Facts ¶ 4; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 4.) In 2006, Sykes, a member of Horizon Holding, executed three limited durable powers of attorney to Byrd to effect the Lamar Crossing project transaction. (See Arvest's Statement of Material Facts ¶ 5; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 5; Ex. C, at 54, ECF No. 42-6; Answer of Orson Sykes to Am. Compl. ¶ 5, ECF No. 24 ("Answer").) The Lamar Crossing project transaction closed on June 14, 2007. (See Arvest's Statement of Material Facts ¶ 18; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 18.)

According to Arvest, Byrd represented to Arvest and the other entities in the Lamar Crossing project transaction that Sykes and James Hutton ("Hutton") were the sole members and

3

owners of Horizon Holding and that Byrd had only a managerial role as chief manager of Horizon Holding. (See Arvest's Statement of Material Facts ¶ 9.) Arvest asserts that, at the closing of the Lamar Crossing project in June 2007, Byrd provided a closing certificate of Lessee Lamar Crossing Apartments, LP ("Lessee"), and, on behalf of the Lessee, Byrd represented that the information in that closing certificate was true and accurate. (See id. ¶ 12.) Arvest also asserts that, at the closing of the Lamar Crossing project in June 2007, Byrd provided a closing certificate of General Partner Horizon Holding and represented that the information in that closing certificate was true and accurate. (See id. ¶ 13.)

Contrary to Byrd's representations to Arvest, Sykes and Hutton were not the only members and owners of Horizon Holding in June 2007. (Id. ¶ 24.) Pursuant to a Membership Interest Transfer Agreement dated March 17, 2006, Sykes had transferred an 80.05% majority membership interest to Horizon Financial Group, LLC ("Horizon Financial"), and Sykes had retained only a 19.95% membership interest in Horizon Holding, not the 87% membership interest falsely represented in the operating agreement, the memorandum of action, and a 2006 tax return. (Id.) Byrd was initially the majority owner of Horizon Financial and, on January 5, 2006, he purportedly transferred his majority interest in Horizon Financial to Donette L. Byrd

4

for no consideration. (Id. ¶ 25.) Byrd never disclosed to Arvest or to any other entity in the Lamar Crossing project transaction that Horizon Financial was the true majority owner of Horizon Holding or that Donette L. Byrd was the majority owner of Horizon Financial. (Id. ¶ 26.)

According to Sykes, Arvest's factual statements about Byrd's alleged representations rest on hearsay. (See Sykes' Resp. to Arvest's Statement of Material Facts ¶¶ 9, 12-13, 24.) Beyond the language in the closing certificates, the only evidence of Byrd's representations to Arvest is the affidavit of Rod Steeves ("Steeves"), a senior vice president of Arvest Bank. (See Arvest's Statement of Material Facts ¶¶ 9, 12-13; Sykes' Resp. to Arvest's Statement of Material Facts ¶¶ 9, 12-13; Aff. of Rod Steeves ¶ 1, ECF No. 42-3.) During Steeves' deposition, he testified that he only became actively involved in the Lamar Crossing project transaction after problems arose in 2008. (See Dep. of Rod Steeves 34:11, 42:15-43:10, ECF No. 56-3.) Before that, Steeves "wasn't involved in any more than just a credit memorandum and – and that's reviewing the questions that [Arvest] would have had at committee level on anything that was in the credit memorandum" and "[t]hat was the only parties [sic] [Steeves] would have been familiar with and the only thing that [he] would have had to do with this project at that point." (Id. 43:2-10.)

5

After the Lamar Crossing project transaction closed on June 14, 2007, construction began. (See Arvest's Statement of Material Facts ¶ 18; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 18.) Byrd converted construction draw funds to his personal use, causing the Lessee and Horizon Holding to breach and default on Lamar Crossing project agreements, which resulted in financial loss to Arvest. (See Arvest's Statement of Material Facts ¶ 22; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 22.) On April 16, 2008, general contractor Patton Taylor stopped work on the Lamar Crossing project for nonpayment of a requisition. (See Arvest's Statement of Material Facts ¶ 20; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 20.) On May 7, 2008, Patton Taylor gave written notice that the construction contract was terminated for nonpayment of a requisition and draw request. (See Arvest's Statement of Material Facts ¶ 21; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 21.) On May 9, 2008, Patton Taylor filed a lien on the Lamar Crossing project for the amounts the Lessee owed. (See Arvest's Statement of Material Facts ¶ 23; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 23.)

Construction of the Lamar Crossing project remains incomplete. (See Arvest's Statement of Material Facts ¶ 28; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 28.)

Arvest, through its successor trustee, foreclosed on the Lamar Crossing real property.  (See Arvest's Statement of Material Facts ¶ 29; Sykes' Resp. to Arvest's Statement of Material Facts ¶ 29.)  After the Lamar Crossing real property was sold at a foreclosure sale, Arvest was owed $3,291,206.13 as a deficiency on the loan for the Lamar Crossing project as of September 16, 2009, with daily interest of $554.55 accruing on the underlying debt since that date.  (See Arvest's Statement of Material Facts ¶¶ 30-32; Sykes' Resp. to Arvest's Statement of Material Facts ¶¶ 30-32.)

## II.  Jurisdiction and Choice of Law

Under 28 U.S.C. § 1332(a)(1), this Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs" between citizens of different states.  28 U.S.C. § 1332(a)(1).  Arvest is an Arkansas corporation with its principal place of business in Arkansas.  (Am. Compl. ¶ 2, ECF No. 19.)  Sykes is an Oklahoma citizen, and Hutton is a Texas citizen.  (Id. ¶¶ 3-4; Answer ¶¶ 3-4.)  Horizon Holding is a limited liability company.  (See Am. Compl. ¶ 5; Answer ¶ 5.)  As such, it has the citizenship of each of its members.  Delay v. Rosenthal Collins Grp., LLC, 585 F.3d 1003, 1005 (6th Cir. 2009).  None of its members is an Arkansas citizen.  (See Answer ¶¶ 3-5 (admitting that Sykes and Hutton are members, Sykes is an

7

Oklahoma citizen, and Hutton is a Texas citizen); Arvest's Statement of Material Facts ¶¶ 24-25 (stating that Sykes transferred an 80.05% majority membership interest to Horizon Financial, a limited liability company, and retained a 19.95% interest in Horizon Holding, and stating that Byrd was initially the majority owner of Horizon Financial and, on January 5, 2006, Byrd transferred his majority interest in Horizon Financial to Donette L. Byrd for no consideration); Defs. Answer to Second Am. Compl. ¶¶ 3-4, Case No. 10-2004, ECF No. 28 (admitting that Byrd and Donette L. Byrd are Tennessee citizens).) Therefore, complete diversity exists. V&M Star, LP v. Centimark Corp., 596 F.3d 354, 355 (6th Cir. 2010).

Arvest seeks damages against Sykes, Hutton, and Horizon Holding of not less than $6 million for breach of two agreements, and damages against Sykes of not less than $6 million for fraud and intentional misrepresentation. (See Am. Compl. 14.) More than $75,000 is in controversy, satisfying the amount-in-controversy requirement. See 28 U.S.C. § 1332(a). Therefore, this Court has diversity jurisdiction. See id.

In a diversity action, state substantive law governs. See Montgomery v. Wyeth, 580 F.3d 455, 459 (6th Cir. 2009) (citation omitted); Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 894 (6th Cir. 1997) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). A federal district court must apply the choice-of-

8

law rules of the state in which it sits. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Montgomery, 580 F.3d at 459 (citation omitted).

For tort claims, Tennessee follows the "most significant relationship" rule, which provides that "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation." Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992). To determine which state has the "most significant relationship," Tennessee courts consider seven principles:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability, and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Timoshchuk v. Long of Chattanooga Mercedes-Benz, No. E2008-01562-COA-R3-CV, 2009 WL 3230961, at *10 (Tenn. Ct. App. Oct. 8, 2009) (quoting Restatement (Second) of Conflict of Laws § 6 (1971)). When applying those principles, courts must consider

9

four factors: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, [and] (d) the place where the relationship, if any, between the parties is centered." Id. at *10-11 (quoting Restatement (Second) of Conflict of Laws § 145 (1971); accord Hataway, 830 S.W.2d at 59. "[T]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." Timoshchuk, 2009 WL 3230961, at *11; accord Hataway, 830 S.W.2d at 59.

Here, Arvest and Sykes agree that Tennessee law applies to Arvest's claim for fraud and intentional misrepresentation against Sykes. (See Pl. Arvest Bank's Mem. in Supp. of Mot. for Summ. J. Against Def. Orson T. Sykes for Fraud 10-14, ECF No. 42-1 (arguing that Sykes is liable to Arvest for fraud in the inducement of contract under Tennessee law) ("Arvest's Mem."); Sykes' Resp. 4-17 (arguing that Arvest has not established that Sykes is liable for fraud under Tennessee law).) Although Arvest's principal place of business is in Arkansas, Arvest lent money through bonds issued in Tennessee and allegedly suffered harm because of acts in Tennessee by Byrd, Sykes, Hutton, and entities participating in the Lamar Crossing project transaction. (See Arvest's Statement of Material Facts ¶¶ 1, 3-4, 9, 12-13, 22, 30, 33-34.) Even if Arvest ultimately suffered

10

financial harm in Arkansas, the conduct causing its injury occurred in Tennessee, the parties and entities did much of their business with Arvest in Tennessee, and the relationship between the parties and entities was centered in Tennessee. (See id. ¶¶ 1, 3-4, 9, 12-13, 22, 29-34.) Tennessee has a more significant relationship to the litigation. See Hataway, 830 S.W.2d at 59. No principle weighs against applying Tennessee law. See Timoshchuk, 2009 WL 3230961, at *10-11. Therefore, the Court will apply Tennessee law to Arvest's claim for fraud and intentional misrepresentation against Sykes. See Hataway, 830 S.W.2d at 59; Timoshchuk, 2009 WL 3230961, at *10; see also GBJ Corp. v. E. Ohio Paving Co., 139 F.3d 1080, 1085 (6th Cir. 1998); In re Korean Air Lines Disaster of Sept. 1, 1983, 932 F.2d 1475, 1495 (D.C. Cir. 1991).

**III. Standard of Review**

"Summary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." Hunt v. Cromartie, 526 U.S. 541, 553 (1999). "When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material

11

Fact, 99 F.R.D. 465, 487-88 (1984)).  "But where the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  Id. (quoting Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, at 488) (emphasis in original); see also Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir. 2008); Arnett v. Myers, 281 F.3d 552, 561 (6th Cir. 2002); Cockrel v. Shelby Cnty. Sch. Dist., 270 F.3d 1036, 1056 (6th Cir. 2001); cf. Timmer v. Mich. Dep't of Commerce, 104 F.3d 833, 843 (6th Cir. 1997) ("[I]f the moving party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.") (citation omitted); 11 James William Moore, Moore's Federal Practice § 56.13[1], at 56-162 (3d ed. 2010) ("[I]f the movant has the burden of persuasion on an issue, the movant must make a stronger claim to summary judgment by introducing supporting evidence that would conclusively establish movant's right to a judgment after trial should nonmovant fail to rebut the evidence.").

**IV.   Analysis**

Arvest has moved for summary judgment on its claim of fraud against Sykes.³ (See Arvest's Mot. 1-2.) Arvest argues that Sykes is liable to it for fraud in the inducement of contract by Byrd, his agent and attorney-in-fact, because Byrd intentionally misrepresented the members and ownership of Horizon Holding. (See Arvest's Mem. 10-14.) Sykes argues that Arvest's Motion should be denied because it has not met its burden. (See Sykes' Resp. 4-17.)

"In actions for fraud, a plaintiff must prove four elements: (1) an intentional misrepresentation of a material fact; (2) knowledge of the representation's falsity; (3) an injury caused by reasonable reliance on the representation; and (4) the misrepresentation involves a past or existing fact." Morgan Dev., LLC v. Morrow, No. E2010-00610-COA-R3-CV, 2011 WL 662948, at *5 (Tenn. Ct. App. Feb. 23, 2011) (citing Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n, 835 S.W.2d 25, 28-29 (Tenn. Ct. App. 1992)); accord Kincaid v. SouthTrust Bank, 221 S.W.3d 32, 40 (Tenn. Ct. App. 2006). A plaintiff must establish five elements to prove fraud in the inducement of a contract:

> (1) [the existence of] a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth;

---

³ Arvest's Amended Complaint asserts a count for fraud and intentional misrepresentation against Sykes. (See Am. Compl. 11.) To the extent fraud and intentional misrepresentation are separate torts, Arvest has moved for summary judgment only on its fraud claim. (See Arvest's Mot. 1-2.)

13

>       (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; (5) an injury resulting from the reliance.

Blackburn & McCune, PLLC v. Pre-Paid Legal Servs., Inc., No. M2009-01584-COA-R3-CV, 2010 WL 2670816, at *11 (Tenn. Ct. App. June 30, 2010) (quoting Lamb v. MegaFlight, Inc., 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000)) (alteration in original); see also Baugh v. Novak, --- S.W.3d ---, No. M2008-02438-SC-R11-CV, 2011 WL 1935839, at *12 (Tenn. May 20, 2011) ("To be successful, a party making a fraudulent inducement claim has the burden of proving that the defendant (1) made a false statement concerning a fact material to the transaction (2) with knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) the statement was reasonably relied upon, and (5) an injury resulted from this reliance.") (citations omitted).

Here, Arvest seeks to impose liability on Sykes for Byrd's actions. (See Arvest's Mem. 10-14.) Arvest argues that Byrd committed fraud against it in the inducement of contract in the Lamar Crossing project transaction. (See id. at 10.) Arvest asserts that Byrd intentionally misrepresented to it that Sykes and Hutton were the only members of Horizon Holding, concealing Byrd's wife's majority ownership interest through Horizon Financial to induce Arvest to participate in, finance, and

14

purchase the bonds for the Lamar Crossing project. (See id.) Byrd allegedly made the representations because he knew that Arvest would not agree to finance the bond transaction with a business he owned or controlled given his recent felony conviction for wire fraud. (See id.) Arvest contends that an agency relationship existed between Sykes and Byrd such that Sykes is vicariously liable for Byrd's fraudulent acts. (See id. at 11-14.)

Although Arvest has supported its assertions about Byrd's representations by a sworn affidavit from Steeves, Steeves' deposition testimony shows that he does not have firsthand knowledge of Byrd's representations. (See Dep. of Rod Steeves 34:11, 42:15-43:10.) Steeves testified that he only became actively involved in the Lamar Crossing project transaction after problems arose in 2008. (See id. 42:15-25.) Before that, Steeves "wasn't involved in any more than just a credit memorandum and – and that's reviewing the questions that [Arvest] would have had at committee level on anything that was in the credit memorandum" and "[t]hat was the only parties [sic] [Steeves] would have been familiar with and the only thing that [he] would have had to do with this project at that point." (Id. 43:2-10.)

Other than the closing certificates attached to Arvest's motion, Steeves' affidavit is the only basis for Arvest's

15

factual statements about Byrd's alleged misrepresentations. (See Arvest's Statement of Material Facts ¶¶ 9, 12-13.) Because Steeves' testimony about Byrd's representations appears to be based on hearsay and not personal knowledge, the Court cannot consider it. See Wiley v. United States, 20 F.3d 222, 225-26 (6th Cir. 1994) ("Rule 56(e) requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies of all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.") (citations omitted); see also Totman v. Louisville Jefferson Cnty. Metro Gov't, 391 F. App'x 454, 464 (6th Cir. 2010); Simpson v. Vanderbilt Univ., 359 F. App'x 562, 569 (6th Cir. 2009).

Byrd signed the Closing Certificate of Lessee as chief manager on behalf of Horizon Financial. (See Closing Certificate of Lessee 4, ECF No. 42-5.) He signed the Closing Certificate of General Partner Horizon Holding as chief manager on behalf of Horizon Holding. (See Closing Certificate of General Partner 3, ECF No. 42-6.) Byrd did not purport to make representations on Sykes' behalf as his personal agent or attorney-in-fact on the face of either closing certificate.

16

(See Closing Certificate of Lessee; Closing Certificate of General Partner.)

Arvest has not offered admissible evidence satisfying the burden of persuasion so powerful that no reasonable jury would be free to disbelieve it. Its evidence that Byrd intentionally misrepresented material facts is based in significant part on inadmissible hearsay that the Court may not consider in deciding Arvest's summary judgment motion. (See, e.g., Arvest's Statement of Material Facts ¶¶ 9, 12-13.) Based on the admissible evidence presented, a reasonable jury could find that Byrd did not make an intentional misrepresentation of material fact, an element Arvest must show to prove fraud. See Morgan Dev., LLC, 2011 WL 662948, at *5. A reasonable jury could also find based on the admissible evidence now before the Court that Byrd did not make a false statement about a fact material to the transaction, an element Arvest must show to prove fraud in the inducement of contract. See Baugh, 2011 WL 1935839, at *12; Blackburn & McCune, PLLC, 2010 WL 2670816, at *11. Arvest has not presented evidence of Byrd's state of mind sufficiently powerful that a reasonable jury could only find that Byrd knew of his statements' falsity or utterly disregarded their truth, another element Arvest must prove to establish fraud and fraud in the inducement of contract. See Baugh, 2011 WL 1935839, at *12; Morgan Dev., LLC, 2011 WL 662948, at *5; Blackburn &

McCune, PLLC, 2010 WL 2670816, at *11. Because the admissible evidence Arvest offers is susceptible of different reasonable interpretations or inferences, summary judgment is inappropriate. See Hunt, 526 U.S. at 553.

Even if Arvest could prove all of the necessary elements as to Byrd, it would not necessarily establish that Byrd's conduct could be attributable to Sykes as a matter of law. Arvest's position that "[u]nder Tennessee law, the fraud of the agent is the fraud of the principal regardless of whether the principal knows of and consents to the fraud" is not necessarily accurate. See McReynolds v. McReynolds, No. 01-A-019109CV00315, 1992 WL 14127, at *3-4 (Tenn. Ct. App. Jan. 31, 1992); (Arvest's Mem. 11). In McReynolds, the Tennessee Court of Appeals held that, when a husband's lawyer absconded with the proceeds from the sale of the husband's and wife's house during their divorce, the husband was not liable to the wife for her share of the proceeds. See McReynolds, 1992 WL 14127, at *1-4. The Court of Appeals acknowledged that a principal may be liable to third persons for fraud when he puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud on third persons. See id. at *2. Nevertheless, the court stated that a principal is generally not liable for the acts of an agent outside the scope of the agent's authority. See id. Because no evidence supported the husband's

18

responsibility for the agent's bad acts, the court concluded that the husband was not liable to his wife for the funds embezzled by his attorney. See id. at *3.

Here, a reasonable jury could conclude that any representations Byrd made to advance his alleged scheme of defrauding Arvest were beyond the scope of any agency relationship he had with Sykes. If a reasonable jury drew that conclusion, it could reasonably find Sykes not liable for Byrd's acts. See id. at *1-4; see also Bells Banking Co. v. Jackson Centre, Inc., 938 S.W.2d 421, 428 (Tenn. Ct. App. 1996) ("In the absence of a retention of benefits with knowledge of the fraud the principal can be held [liable] for the agent's fraud only if perpetrated while acting within the course and scope of the agent's authority. It is not sufficient to impose liability upon the principal that the principal might have benefited by the agent's wrongful and unauthorized act." (quoting Hill v. Hill, 241 S.W.2d 865, 871 (Tenn. Ct. App. 1951))) (alteration in original).

Although the powers of attorney executed by Sykes created a principal-agent relationship, see Tenn. Farmers Life Reassurance Co. v. Rose, 239 S.W.3d 743, 749 (Tenn. 2007), the record demonstrates that Byrd was chief manager of Horizon Holding and Horizon Financial, (see Closing Certificate of Lessee 4; Closing Certificate of General Partner 3). A reasonable jury could

19

conclude that Byrd acted as an agent of Horizon Holding and Horizon Financial during the Lamar Crossing project transaction and made representations on their behalf, not Sykes'. See Sec. Fed. Sav. & Loan Ass'n of Nashville v. Riviera, Ltd., 856 S.W.2d 709, 715 (Tenn. Ct. App. 1992). In that event, a reasonable jury could find Sykes not liable for Byrd's acts and statements during the Lamar Crossing project transaction. See id.

Arvest has not made a sufficient showing for the Court to hold that a reasonable trier of fact must find in its favor. The record does not contain admissible evidence satisfying the burden of persuasion that is so powerful that no reasonable jury would be free to disbelieve it. The evidence is susceptible of different reasonable interpretations or inferences by the trier of fact. Therefore, Arvest is not entitled to summary judgment on its claim against Sykes for fraud. See Hunt, 526 U.S. at 553; Calderone, 799 F.2d at 259.

**V.   Conclusion**

For the foregoing reasons, Arvest's Motion is DENIED.

So ordered this 5th day of July, 2011.

                                        s/ Samuel H. Mays, Jr.
                                        SAMUEL H. MAYS, JR.
                                        UNITED STATES DISTRICT JUDGE